1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

11
12
13

| | |
|---|---|
| JANET BOWEN, | Case No. 1:14-CV-00397-LJO-JLT |
| Plaintiff, | |
| v. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. |
| M. CARATAN, INC., DOING BUSINESS AS COLUMBINE VINEYARDS; AND, DOES 1 THROUGH 10, | |
| Defendants. | (Doc. 15) |

14
15
16
17
18
19
20
21

22      Before the Court in the above-styled and numbered cause of action is Defendants M.

23   Caratan, Inc.'s, doing business as Columbine Vineyards ("Columbine," or "Defendants") Motion

24   for Summary Judgment, filed July 22, 2015. (Doc. 15). Plaintiff Janet Bowen ("Plaintiff," or

25   "Bowen") filed her Opposition on August 17, 2015 (Doc. 17), and Defendants filed a Reply on

26   August 25, 2015 (Doc. 19). The motion is appropriate for resolution without oral argument. *See*

27   Local Rule 230(g). Having considered the record in this case, the parties' briefing, and the relevant

28   law, the Court will deny Defendants' motion.

# BACKGROUND

## I.  FACTUAL BACKGROUND

The following relevant facts come primarily from Plaintiff's Complaint ("Compl.," Doc. 1); the parties' Joint Statement of Undisputed Material Facts ("JSUMF," Doc. 15-3). Defendants' Separate Statement of Uncontroverted [Material] Facts ("DSSUMF," 15-2); Plaintiff's Response to Defendants' Statement of Undisputed [Material] Facts" ("PRSUMF," Doc. 17-16); Plaintiff Janet Bowen's Declaration (Doc. 17-1) and Deposition (Doc. 17-11, Ex. 8); the depositions of relevant individuals, including Defendants' former CFO and Plaintiff's former supervisor Darrell Knox, Defendants' controller and Plaintiff's former supervisor Kevin Canaday, Defendants' human resources officer Jessica Jones, Defendants' employee and Plaintiff's former co-worker Cecelia Valdez, Defendants' former employee and Plaintiff's former co-worker Patricia Bowshier ("Knox Depo.," Doc. 17-8; "Canaday Depo.," Doc. 17-9; "Jones Depo.," Doc. 17-10; "Valdez Depo.," Docs. 15-5 Ex. 19, 17-12; "Bowshier Depo.," Doc. 17-13); the declarations of relevant individuals, including Jonathan Thomas, Randall M. Rumph, Kevin Canaday, Cecelia Valdez, and Gary Leasure ("Thomas Decl.," Doc. 17-2; "Rumph Decl.," Doc. 17-3; "Canaday Decl.," Doc. 15-5, Ex. 13; "Valdez Decl.," Doc. 15-5 Ex. 19; "Leasure Decl.," Doc. 15-4, 5); electronic communication between Columbine employees (Doc. 17-4); Bowen's employment application (Doc. 17-5); a letter from counsel to the Labor & Workforce Development Agency (Doc. 17-6); Laura Hill's declaration and electronic communications (Docs. 18, 17-7); two letters from the Department of Labor to Defendants, the first identifying interviewees (the "DOL letter," Doc. 17-15, 15-5 Ex. 21), another about the wage and hour investigation (Doc. 15-5, Ex. 20); Defendants' employee exemption status change form (Doc. 15-5 Ex. 26); Plaintiff's Notice of Termination dated November 12, 2013 (Doc. 15-5 Ex. 24).

### A.  The Parties

Defendants are growers of table grapes with growing fields and principal offices located in Delano, California. DSSUF ¶ 1; PRSUF ¶ 1.

Plaintiff, at all relevant times before her termination, was employed at Columbine as a Senior Accountant.

**B. Stipulated and Undisputed Facts**

Defendants hired Plaintiff as an accountant in April 2012. JUMF ¶ 1. Plaintiff received an accounting degree from the University of Phoenix in October 2012. JUMF ¶ 2. The United States Department of Labor ("the DOL") advised Defendants in a letter on or about September 19, 2013, that it intended to conduct an audit to determine the company's compliance with the Fair Labor Standards Act ("FLSA"). JUMF ¶ 3. In another letter on or about October 18, 2013, the DOL advised Defendants that it intended to interview certain of Defendants' employees and gave a list of fourteen employees. JUMF ¶ 4. Among the Columbine employees on the DOL's list were Plaintiff and Patricia Bowshier ("Ms. Bowshier"). Plaintiff claims she was concerned about Ms. Bowshier's classification status as an "exempt" employee. JUMF ¶ 6. Other than Ms. Bowshier, Plaintiff never advised anyone else that an employee may be improperly classified. JUMF ¶ 6. After the conclusion of the DOL audit, Ms. Bowshier was reclassified as a "non-exempt" employee. JUMF ¶ 9. Defendants did not terminate Ms. Bowshier's employment. JUMF ¶ 10. Ms. Bowshier continued to work at Caratan until November 2014, when she accepted a controller position elsewhere. JUMF ¶ 10.

Defendants terminated Plaintiff's employment on November 12, 2013. JUMF ¶ 7. Defendants' given reason for terminating Plaintiff was that she lied by stating on her job application that she had a degree in accounting from the University of Phoenix when, in fact, she did not have such a degree at the time she applied. JUMF ¶ 8.

In or around April 2012, Columbine used an outside staffing company, Creative Financial Staffing ("CFS"), which recruits accountants and related personnel in Bakersfield, California, to find a Senior Accountant for its Delano office. DSSUF ¶ 2; PRSUMF ¶ 2.

Plaintiff previously worked in several accounting departments. DSSUMF ¶ 3; PRSUMF ¶ 3. She sought CFS's services to assist her in finding a full-time accounting position. DSSUMF ¶ 3; PRSUMF ¶ 3.

Laura Hill, a CFS recruiter, told Plaintiff about the Senior Accountant position at Columbine. DSSUMF ¶ 3; PRSUMF ¶ 3. CFS gave Columbine's controller, also known as M. Caratan's Chief Financial officer, Jerry Meadows ("Mr. Meadows"), Plaintiff's résumé prior to his

interviewing her. DSSUMF ¶ 6, 29; PRSUMF ¶ 6, 29. Plaintiff's résumé indicated that she had a Bachelor of Science degree in Accounting conferred in February 2012 from the University of Phoenix. DSSUMF ¶ 7; PRSUMF ¶ 7.

Soon after her interview, Defendants offered Plaintiff the Senior Accountant position. DSSUMF ¶¶ 10-12; PRSUMF ¶ 10-12. Plaintiff accepted the job and began working at Columbine on April 30, 2012. DSSUMF ¶ 13; PRSUMF ¶ 13. As part of her duties as a Senior Accountant, Plaintiff supervised accounts payable personnel. DSSUMF ¶ 30.

On her first day, someone at Columbine asked Plaintiff to complete an application for employment ("the Application"). DSSUMF ¶ 14; PRSUMF ¶ 14. On its first page, under the Application's "Education/U.S. Military Service" heading, Plaintiff stated that she had attended the University of Phoenix and listed her major as "accounting." DSSUMF ¶ 15; PRSUMF ¶ 15.

Plaintiff completed an "Additional Acknowledgements" form, executed on April 30, 2012. DSSUMF ¶ 18, 22; PRSUMF ¶ 18, 22. On this form Plaintiff initialed at paragraph three that she understood that any misrepresentation of a material fact in applying for employment with Columbine would be grounds for immediate discharge, regardless of the time elapsed before discovery. DSSUMF ¶ 19; PRSUMF ¶ 19. On the same form at paragraph five, Plaintiff initialed that she understood that her employment at Columbine was not for any definite period of time. DSSUMF ¶ 21; PRSUMF ¶ 21.

On the same day, Plaintiff executed an "Employee Acknowledgements" form, which indicated that Plaintiff's employment was "at will." DSSUMF ¶ 23; PRSUMF ¶ 23. In the "Conditions of Employment" section Plaintiff indicated that she knew that she was an "at will" employee and that either party could terminate the relationship at any time. DSSUMF ¶ 24; PRSUMF ¶ 24.

For a period of approximately three months at the start of Plaintiff's tenure at Columbine, before Meadows left the company, he was Plaintiff's supervisor. DSSUMF ¶ 27; PRSUMF ¶ 27. To replace Meadows upon his departure in 2012 as Chief Financial Officer, Columbine hired Kevin Canaday ("Canaday"). DSSUMF ¶ 29; PRSUMF ¶ 29. After Meadows's departure sometime in

2012, Canaday was Plaintiff's direct supervisor. DSSUMF ¶ 28; PRSUMF 28. In 2013, Columbine changed Canaday's title to Director of Accounting. DSSUMF ¶ 29; PRSUMF ¶ 29.

On or about September 2012, Plaintiff asked for and Canaday approved her time off to attend classes. DSSUMF ¶ 31, 32; PRSUMF ¶ 31, 32. Columbine's Chief Financial Officer and Canaday's supervisor, Darrel Knox ("Knox"), overheard Plaintiff say that she needed to take time off to study for a test. DSSUMF ¶ 33; PRSUMF ¶ 33.

In October 2012, Plaintiff received her degree from the University of Phoenix. DSSUMF ¶ 34; PRSUMF 34. Someone placed Plaintiff's University of Phoenix transcript, now reflecting her degree, in Plaintiff's human resources file. DSSUMF ¶ 35; PRSUMF ¶ 35.

**C. Disputed Facts**

***Events Leading to Plaintiff's Employment at Columbine***

According to Defendants, CFS informed neither Columbine nor Meadows about Plaintiff's lack of degree. DSSUMF ¶ 62. Jerry Meadows ("Meadows"), Columbine's controller, described for CFS what he sought in a Senior Accountant candidate. DSSUMF ¶ 4. Specifically, Meadows sought a "degreed" accountant with a background in an accounting software called "Famous." DSSUMF ¶ 4. Defendants contend that CFS provided candidates that it believed met Meadows's requirements. DSSUMF ¶ 4. When Meadows interviewed Plaintiff in approximately mid-April 2012, he believed that she had a degree in accounting, although she did not. DSSUMF ¶ 8, 9. Plaintiff testified that her early 2012 résumé was incorrect. DSSUMF ¶ 25.

Plaintiff also testified that her Application was incorrect in that it reflected that she had a degree in accounting, when she did not. DSSUMF ¶ 26. In her Application, Defendants contend that Plaintiff stated that she had a degree in accounting at the time she was hired. DSSUMF ¶ 51. On her Application, under the subheading "Degrees and/or Diplomas," Plaintiff wrote information relative to her degree in accounting. DSSUMF ¶ 16. Underneath the accounting degree information, the Application had a question which asked whether the applicant was taking any educational courses, but Plaintiff left the response area blank. DSSUMF ¶ 17.

On April 17, 2012, Defendants provided to Plaintiff an offer of employment, a document referred to as a Statement of Agreement (the "Agreement"). DSSUMF ¶ 10. The Agreement

outlined who her supervisor would be, as well as her salary, bonus, benefits and paid time off. DSSUMF ¶ 10. The Agreement also specified that Plaintiff's employment would be "at will." DSSUMF ¶ 10. Plaintiff testified that during her interview she received a Statement of Agreement from Meadows. DSSUMF ¶ 11.  She further testified that she understood that she would be an "at will" employee should she accept the employment offered, and demonstrated a knowledge of what "at will" meant. DSSUMF ¶ 11. Soon after it was made, Plaintiff accepted Defendants' offer of employment. DSSUMF ¶ 12.

Plaintiff generally disputes Defendants' claim of ignorance of her relative progress toward an accounting degree prior to hiring her. PRSUMF 4. Rather, Plaintiff asserts that at some point prior to Columbine's hiring Plaintiff, someone at CFS informed Knox that Plaintiff did not have a degree. *See* Bowen Decl. ¶ 5. Plaintiff asserts that she gave Columbine the same information. In her Complaint, Plaintiff claims that she interviewed with two of Columbine's managers during which she advised both that she expected her degree to be conferred in approximately six months, and the two managers advised her that this was "Okay." *See* Compl. Moreover, when she applied for the Senior Accounting position, Plaintiff held an accounting degree from Sir Sandford Fleming College in Peterborough, Ontario. Bowen Decl. ¶ 2.

Defendants contend that contrary to allegations in her Complaint, Plaintiff testified that she interviewed with Meadows, but only met Knox, implying that she did not actually interact with him about her degree. DSSUMF ¶ 63. Defendants contend that both Meadows and Knox thought that Plaintiff had a degree, and Plaintiff never told either Meadows or Knox otherwise. DSSUMF ¶ 64. Disputing Defendants' characterization of her testimony, Plaintiff asserts that she testified that she told Knox about her progress towards her degree during a different, second interview. PRSUMF ¶ 63.

Defendants assert that contrary to Plaintiff's testimony that Meadows told her not to worry about how she filled out the Application about her anticipated graduation date, Meadows never did so because he was unaware that she had even filled out an employment application. DSSUMF ¶ 66. In her testimony, Plaintiff disputes Defendants' account. PRSUMF ¶ 66.

//

6

### *Columbine Suspends Plaintiff*

The parties agree that in early July 2013, Columbine suspended Plaintiff's employment for two days without pay. DSSUMF ¶ 36; PRSUMF ¶ 36.

Defendants assert that they suspended Plaintiff in July 2013 because Plaintiff changed a co-worker's access to the company computer system without the authority to do so, abusing her role as the administrator of the company's accounting system. DSSUMF ¶ 36. According to Defendants the suspension was also based, at least in part, on Plaintiff's derogatory and disrespectful comments to her co-worker Cecelia Valdez (Ms. Valdez"). DSSUMF ¶ 36.

Plaintiff contends that she was suspended because of an alleged disrespectful comment she made to Ms. Valdez, but that it was not based on any actions related to access changes on the company computer. PRSUMF ¶ 36.

### *Plaintiff's Performance Reviews*

Columbine's position is that they deemed Plaintiff an average worker. DSSUMF ¶ 37. In a mid-July 2013, performance appraisal, Plaintiff's supervisor rated her a "3" out of a possible total of "5" in an overall rating. DSSUMF 37. The written appraisal states that Plaintiff needed to show all employees "respect." DSSUMF ¶ 37. On one occasion Knox requested that Plaintiff conduct an analysis of balance sheet items and, in his opinion, her work product did not reflect the quality he expected from an accountant or senior accountant. DSSUMF ¶ 38. At some point, someone at Columbine decided to relieve Plaintiff of her supervisory duties because someone decided that she was "not the best person to be supervising others." DSSUMF ¶ 30.

Plaintiff asserts that the balance sheet incident is not included in Defendants' performance reviews of Plaintiff and she was never told her work product was inferior. PRSUMF ¶ 38. Further, two of her former supervisors (Canaday and Thomas) gave positive accounts of her work. *See* Canaday Depo., Doc. 17-9 at 28:15-21; Thomas Decl., Doc. 17-2 ¶ 2.

### *Planning for the Audit*

It is uncontroverted that in September 2013, the DOL in a letter notified M. Caratan of its intent to conduct an audit "to determine [M. Caratan's] compliance with [Fair Labor Standards Act] (FLSA)." DSSUMF ¶ 41; PRSUMF ¶ 41. As part of its investigation, the DOL advised the

company that it wanted to "conduct as many employee interviews as possible," and provided a relevant list of employees. DSSUMF ¶ 42; PRSUMF ¶ 42. Of the fourteen listed employees, Patty Bowshier and Plaintiff were included. DSSUMF ¶ 42; PRSUMF ¶ 42.

After they learned about the Audit and that they were on the list of employees DOL hoped to interview, Plaintiff and Bowshier investigated their classification status and questioned whether they were correctly classified as "exempt." DSSUMF ¶ 44; PRSUMF ¶ 44. Their investigation was brief and they only discussed the classification issue between themselves. DSSUMF ¶ 46; PRSUMF ¶ 46. However, Defendants claim that neither woman came to the conclusion that they were incorrectly classified. DSSUMF ¶ 47. In contrast, Plaintiff states that Bowshier felt that she was incorrectly classified and Plaintiff knew this because Bowshier told Plaintiff so. PRSUMF ¶ 47.

The DOL Audit began in October 2013. JSUMF ¶ 4. The parties agree that Bowshier was scheduled to be interviewed by the DOL auditor. DSSUMF ¶ 68; PRSUMF ¶ 68. Bowshier's interview was cancelled, however, when the investigator ran out of time on that particular day. DSSUMF ¶ 68; PRSUMF ¶ 68. Defendants concede that Plaintiff was on the list to be interviewed by the DOL during the audit, but assert that, unlike Bowshier, Plaintiff was never scheduled for an interview and, therefore, could not be and never was "put on hold." DSSUMF ¶ 67. Defendants emphasize that Plaintiff testified that she never spoke to the DOL and had nothing negative to say to the DOL about Columbine. DSSUMF ¶ 69. Defendants aver that Plaintiff testified that she did not know what she would say to the DOL if she had the opportunity. DSSUMF ¶ 69.

In contrast, Plaintiff asserts that she was prepared to testify about both her degree status and Bowshier's duties indicating misclassification under the professional exemption. PRSUMF ¶ 69. Plaintiff contends that her interview with the DOL was put on hold. PRSUMF 67. Further, she asserts that Defendants believed that if the audit revealed that an employee was misclassified, it would result in DOL fines against the company. *See* Doc. 17 at 15; Knox Depo. at 39:22-25.

### *Plaintiff's Workplace Relationships*

Defendants contend that Plaintiff had problems getting along with her co-workers. DSSUMF ¶ 39. In October 2013, as Columbine's staff prepared for their annual company Halloween party, Plaintiff took issue with a picture of the Star Wars character "Chewbacca" that

Ms. Valdez had displayed in her cubicle, and advised Ms.Valdez that she was offended by the

picture. DSSUMF ¶ 39. Plaintiff generally denies this. PRSUMF ¶ 39.

Defendants' account is that Plaintiff expressed that she was offended by the office

Halloween decorations and stated that she felt Halloween was "evil." DSSUMF ¶ 40. In contrast,

Plaintiff contends that she merely stated that she did not want to celebrate Halloween due to her

religious beliefs. PRSUMF ¶ 40. Knox in his deposition clarified Defendants' account, conceding

that he first made a comment to the effect of how Ms. Valdez looks like Chewbacca when she

wakes up in the morning, *see* Knox. Depo., Doc. 17-8 at 37:5-22, and it is this comment about

which Plaintiff said she was offended. *Id.* at 39:8-9. Knox later learned of Plaintiff's take on his

comment, after which he contacted Jessica Jones ("Jones") in human resources to investigate

Plaintiff's human resources file. *Id.* at 40:4-21.

### *Human Resources Action*

In early November 2013, Knox met with Columbine's Human Resources Manager, Jessica

Jones ("Jones"), to discuss Plaintiff's conduct and the incident regarding the Chewbacca picture and

her issues with Halloween decorations. DSSUMF ¶ 48. Plaintiff contends that Knox met with Jones

only to review Plaintiff's employee file in order to determine her degree status. PRSUMF ¶ 48.

The parties agree that Jones reviewed Plaintiff's file and, from the transcript found within it,

discovered that Plaintiff had a degree, but that it was conferred October 20, 2012, nearly six months

after she was hired. DSSUMF ¶ 50; PRSUMF ¶ 50. Defendants claim ignorance about who initially

put Plaintiff's degree transcript in the company file. DSSUMF ¶ 36; PRSUMF ¶ 36.

Based on the information Jones found in the human resources file, Jones advised Knox that

Plaintiff did not have a degree when hired. DSSUMF ¶ 53; PRSUMF ¶ 53. Knox did not ask for

any further investigation to elicit an explanation. Jones Depo. at 25-27. On the basis of Jones's

findings, Knox instructed Canaday to terminate Plaintiff's employment. DSSUMF ¶ 54. Jones

testified that Knox told her to terminate Plaintiff because she lied on her résumé about having a

degree and instructed Jones to document that Plaintiff "lied." *See* Jones Depo. at 54:4-9. Defendants

terminated Plaintiff's employment on November 12, 2013. DSSUMF ¶ 55; PRSUMF ¶ 55.

*//*

1

*Audit Results*

2       The parties agree that the DOL audit was completed in December 2013. DSSUMF ¶ 56;

3   PRSUMF ¶ 56. According to Defendants, the DOL's single finding was that Columbine had not

4   paid three gardeners a collective total of $12,222.18 in wages. DSSUMF ¶ 56. Plaintiff agrees, but

5   contends that it was not the DOL's only finding. PRSUMF ¶ 56.

6       According to Defendants, the DOL did not find that Plaintiff or Bowshier were improperly

7   classified. DSSUMF ¶ 57. However, Plaintiff asserts that Defendants offer only Canaday's

8   conclusion but that he lacks personal knowledge on the subject. PRSUMF ¶ 57.

9       Plaintiff does not challenge that Bowshier remained classified as an "exempt" employee

10   throughout the DOL audit. DSSUMF ¶ 58; PRSUMF ¶ 58. And Defendants admits that because

11   Bowshier was not supervising any employees Columbine reclassified her as a "non-exempt"

12   employee on February 17, 2014. DSSUMF ¶ 59; PRSUMF ¶ 59.

13       Defendants contend that the DOL audit had nothing to do with the change in Bowshier's

14   classification. DSSUMF ¶ 60. Plaintiff challenges this conclusion. She asserts that the change to

15   Bowshier's classification happened after Plaintiff sent a "PAGA notice" under California Labor

16   Code § 2699 (the "Private Attorneys General Act" or "PAGA") to Defendants, supporting

17   Plaintiff's contention that the DOL audit impacted the reclassification. PRSUMF ¶ 60.

18       Defendants highlight and Plaintiff does not dispute her testimony that she did "not recall" if

19   she told anyone that she might speak to the DOL about any questions she may have had regarding

20   Bowshier's classification status. DSSUMF ¶ 70; PRSUMF ¶ 70. Defendants contend that Canaday,

21   Knox, and Jones were the only individuals responsible for terminating Plaintiff, and they had

22   absolutely no hint that Plaintiff may have been contemplating speaking to the DOL investigator

23   regarding any exemption status misclassifications, or any other matter. DSSUMF ¶ 71.

24       Plaintiff asserts that this is not a material fact, but also that Knox and Canaday were not only

25   familiar with FLSA exemptions but were aware that Plaintiff did not fall under the professional

26   exemption from April to October 2012. PRSUMF 71.

27       Defendants propose that Columbine had no notice that Plaintiff may have wanted to speak

28   to the DOL about any employee misclassifications. DSSUMF ¶ 71.

1    The parties agree that Bowshier continued to work at Columbine until November 14, 20114,

2    when she terminated her employment to accept a controller position at another company. DSSUM F

3    ¶ 61; PRSUMF ¶ 61.

4                        *Post-Termination Communication*

5    Plaintiff concedes that she is unable to identify any specific prospective employer with

6    whom Columbine communicated that the reason that they terminated her was for lying about her

7    degree. DSSUMF ¶ 72; PRSUMF ¶ 72. Nor does Plaintiff contest Defendants' assertion that she

8    knows of no employment that was denied her because of what anyone at Columbine said about her.

9    DSSUMF ¶ 72; PRSUMF ¶ 72. The parties agree that Columbine has never communicated to any

10   third party, including prospective employers, that Plaintiff-was terminated from her employment at

11   Columbine for lying or for any other reason. DSSUMF ¶ 73; PRSUMF ¶ 73. Indeed, no prospective

12   employers have contacted Columbine about Plaintiff. DSSUMF ¶ 74; PRSUMF ¶ 74.

13   **II.    PROCEDURAL BACKGROUND**

14   Plaintiff filed her Complaint on March 20, 2014 (Doc. 1), in which she alleges five causes

15   of action: (1) retaliatory termination in violation of 29 U.S.C. 215(a)(3), a federal claim (first cause

16   of action); as well as four state-law claims, (2) wrongful termination in violation of public policy

17   implicated by violations of California labor code §1102.5(b) (second cause of action); (3) wrongful

18   discharge in violation of § 1102.5 (third cause of action); (4) violation of California Labor Code §

19   2699 (fourth cause of action); and, (5) defamation (fifth cause of action).

20   Defendants answered on June 10, 2014 (Doc. 5). The Magistrate Judge rendered a

21   Scheduling Order on July 7, 2014 (Doc. 8), setting August 15, 2015 as the dispositive motion

22   deadline. Defendants timely filed their motion for summary judgment on July 22, 2015 (Doc. 15).

23   Plaintiff filed her Opposition on August 17, 2015 (Doc. 17), to which Defendants filed a Reply on

24   August 25, 2015 (Doc. 19). The parties each filed objections[1] to opposition evidence.[2]

25

26   [1] The parties interpose several objections to evidence presented, both within the various statements of fact and in stand-alone objection memoranda. (Docs. 17-17 & 19-1). All but one the Court need not address because in ruling on the

27   instant motion it does not consider the materials to which the parties object. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010). As to Defendants' objection to Bowen's testimony about Laura Hill's e-mail, *see* Doc. 19-1,

28   (Obj. No. 6), because Plaintiff filed Hill's declaration testifying to her personal knowledge on the topic, *see* Doc. 18, Defendants' objection is hereby **OVERRULED**. The parties may address evidentiary issues in pretrial motions.

1  The instant motion is now ripe for review.

2  **LEGAL STANDARD**

3  Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and

4  any affidavits provided establish that "there is no genuine dispute as to any material fact and the

5  movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that

6  may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.,*

7  477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable trier of

8  fact could return a verdict in favor of the nonmoving party." *Id.*

9  The party seeking summary judgment "always bears the initial responsibility of informing

10  the district court of the basis for its motion, and identifying those portions of the pleadings,

11  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

12  which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

13  *Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The exact nature of this

14  responsibility, however, varies depending on whether the issue on which summary judgment is

15  sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See*

16  *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).  If the movant will have the

17  burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of

18  fact could find other than for the moving party." *Id.* at 984.  In contrast, if the nonmoving party will

19  have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an

20  absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex,* 477 U.S. at 323).

21  If the movant satisfies its initial burden, the nonmoving party must go beyond the

22  allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative*

23  *evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik,* 559 F.3d 924, 929 (9th Cir.

24  2009) (emphasis in original).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in

25  this regard. *Id.*, at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S.

26  

27  ²  The Court notes that the parties have, respectively, filed copies of some of the same documents for summary judgment purposes (e.g., the DOL letter (Docs. 15-5 Ex. 21 *and* Doc. 17-15 Ex. 12)). The Court reminds the parties of their obligation, pretrial, to meet and confer in order to produce for the Court a complete pretrial conference statement,

28  including but not limited to a list of uncontested trial exhibits. As officers of the Court, you are required to distill evidentiary issues so that the Court is only called upon to resolve truly unresolvable issues.

574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts") (citation omitted).  "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence. *See Liberty Lobby,* 477 U.S. at 255.  Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. Fed.R.Civ.P. 56(c)(2).  "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun,* 509 F.3d at 984.

## DISCUSSION

This action arises out of Plaintiff's employment at Columbine from April 2012 to November 2013. Each of Plaintiff's claims stem from her termination from the company in late 2013.

## I.   FAIR LABOR STANDARDS ACT

Plaintiff asserts that her termination from Columbine was in retaliation for her known upcoming participation in a DOL audit, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

### A.  First Cause of Action: Retaliatory Termination in Violation of 29 U.S.C. 215(a)(3))

Plaintiff alleges that terminating her employment under these circumstances violates § 215(a)(3) of the FLSA which provides, in relevant part:

> (a) . . . it shall be unlawful for any person—
>> . . . (3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified <u>or is about to testify</u> in any such proceeding, or has served or is about to serve on an industry committee;

29 U.S.C. § 215(a)(3) (emphasis added).

//

13

Retaliation claims are evaluated under the *McDonnell Douglas* burden-shifting framework. 411 U.S. 792; *accord Mayes v. Kaiser Found. Hospitals*, No. 2:12-CV-1726 KJM EFB, 2014 WL 2506195, at *9 (E.D. Cal. June 3, 2014) (applying the burden-shifting scheme of *McDonnell Douglas* where a plaintiff relied on circumstantial evidence to show employer's adverse employment action was retaliatory). Under this framework, a plaintiff must first establish a prima facie case. *See Knickerbocker v. City of Stockton*, 81 F.3d 907, 910 (9th Cir. 1996). If the plaintiff succeeds, the burden shifts to the Defendants to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Avila v. Los Angeles Police Dep't*, 758 F.3d 1096, 1101 (9th Cir. 2014) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 254 (1989); *Knickerbocker,* 81 F.3d at 911). If the Defendants articulates such justification, it is ultimately the plaintiff's burden to demonstrate that the given reason is pretext for a retaliatory or discriminatory motive. *Avila*, 758 F.3d 1101 (requiring that retaliation be a "substantial factor" in adverse action) (citing *Knickerbocker*, 81 F.3d at 911).

### 1.   Prima facie Case

To establish a prima facie case of retaliation, a plaintiff must show: (a) that the Defendants was aware of plaintiff's participation in a protected activity; (b) that an adverse employment action was taken against plaintiff; and, (c) that the protected activity was a substantial motivating factor in the adverse employment action as to that plaintiff. *Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir. 1998).

Defendants argue that they are entitled to summary judgment because Plaintiff cannot establish a prima facie case of retaliation absent notice that she sought to participate in a protected activity. Defendants' primary argument is that it did not have fair notice "that the employee has lodged, or will lodge a grievance of some type." *Kasten v. Saint-Gobain Performance Plastics Corp.,*131 S.Ct. 1325, 1334 (2011).

### a.   Protected Activity

Because Defendants rely on the premise that Plaintiff did not perform a protected activity, the success of Defendants' motion hinges on the statutory interpretation of § 215(a)(3).

14

Defendants concede that § 215(a)(3) protects employees "who complain about violations to their employers." *Lambert,* 180 F.3d at 1004 (en banc). However, Defendants argue that this is "so long as an employee communicates the *substance* of his allegations to his employer . . . ." *Id.* at 1008 (emphasis in original). Defendants emphasize that Plaintiff never complained to them nor gave notice that she would complain to the DOL. According to Defendants, Plaintiff fails to demonstrate a prima facie case and her retaliation claim necessarily fails absent any notice about a complaint, citing *Kasten,* 131 S.Ct. 1325.

Defendants cite *Kasten* for the proposition that an employee who is about to testify in a proceeding related to potential labor violations, but has not herself notified her employer about a complaint, does not elicit FLSA protections. That is not the court's holding. In *Kasten*, the Supreme Court evaluated the narrow question of whether oral complaints, in addition to written complaints, instigate FLSA protections. *See id.* at 1333. To that end, the court reasoned that "[t]o limit the scope of the antiretaliation provision to the filing of written complaints would also take needed flexibility from those charged with the Act's enforcement." *Id.* at 1334. Specifically, the Court noted that to so limit the provision could "prevent Government agencies from using hotlines, interviews, and other oral methods of receiving complaints." *Id.* Within the context of the case, the Court stated that when the predicate for statutory protections is a written or oral complaint, "the statute requires fair notice," in such conditions, but does not address the alternative means of eliciting FLSA protections. *Id.* At bottom, *Kasten* does not hold that the conditions under which FLSA protections may arise is limited to *only* oral or written complaints.

Contrary to Defendants' interpretation, the FLSA explicitly includes language providing that a plaintiff may elicit statutory protections because she "is about to testify" in "any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). Indeed, *Kasten* cites to another Supreme Court case demonstrating that protections for such conduct is well-settled. *Kasten,* 131 S. Ct. at 1334 ("Given the need for effective enforcement of the National Labor Relations Act (NLRA), this Court has broadly interpreted the language of the NLRA's antiretaliation provision—"filed charges or given testimony," 29 U.S.C. § 158(a)(4)—as protecting workers who *neither* filed charges *nor*

15

were "called *formally* to testify" but simply "participate[d] in a [National Labor Relations] Board investigation.""') (alteration in original) (quoting *NLRB v. Scrivener,* 405 U.S. 117, 123 (1972)).

By stripping the statute of language detrimental to their position, Defendants ignore the basic contours of statutory interpretation. Guided by "the fundamental canons of statutory construction," a court "begin[s] with the statutory text." *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015) (citing *BedRoc Ltd., LLC v. United States,* 541 U.S. 176, 183 (2004)). A court interprets statutory terms "in accordance with their ordinary meaning, unless the statute clearly expresses an intention to the contrary." *Id.* (citing *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242 (1989)). Courts must "interpret [the] statut[e] as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Id.* (quoting *Boise Cascade Corp. v. U.S. E.P.A.,* 942 F.2d 1427, 1432 (9th Cir. 1991). And, "[p]articular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme." *Id.* (quoting *United States v. Lewis,* 67 F.3d 225, 228-29 (9th Cir. 1995)).

Notwithstanding Defendants' argument to the contrary, nothing in the provision limits statutory protections to only those employees who have given notice to their employer about a complaint. Finding that the plain language of the statute provides protections to witnesses identified in the investigate phase comports with the purpose of the statute, which was to allow information to flow from employee-witnesses to the regulatory body without economic repercussions to the employees for participating. *See Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292-93 (1960) (explaining Congress's intentions relative to the FLSA's anti-retaliation provision).

Thus the Court declines Defendants' suggestion to construe the statute narrowly and read the words "about to testify" out of it. *See Lambert,* 180 F.3d at 1003 ("because the FLSA is a remedial statute, it must be interpreted broadly") (citing *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597 (1944).

Rather than a complaint, the instant claim stems from protections afforded her once the DOL identified Plaintiff as a potential witness in their audit and, about this, there is no dispute that the DOL notified Defendants. A plaintiff must produce "very little" evidence to establish a prima

facie case. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). Plaintiff meets this low bar because Defendants do not dispute that the DOL was conducting an audit of Columbine's wage and hour practices, a proceeding related to the FLSA, and Defendants admit they knew the DOL had identified Plaintiff as someone whom the investigator wanted to interview in the course of the audit. In other words, Plaintiff was "about to testify" for the DOL audit. Such an audit is an FLSA-related proceeding for the purposes of § 215(a)(3). *See Lambert*, 180 F.3d at 1014-15; *accord Scrivener*, 405 U.S. 117 (interpreting the NLRA's anti-retaliation provision which prohibits retaliation for "giving testimony" to include giving a statement to an investigator). Defendants may contest the facts, arguing that the DOL ran out of time to perform interviews and was no longer interested in interviewing Plaintiff, the Court must at this stage take the evidence in the light most favorable to the nonmoving party. During the audit, communications to Defendants from the DOL illustrate that the investigator was interested in interviewing "a representative number of employees," *see* Doc. 15-5 Ex. 20, and less than a month later, on October 21, 2013, specifically named Plaintiff among fourteen employees he sought to contact. *See* Docs. 15-5, 17-15. Defendants terminated Plaintiff on November 12, 2013, and it undisputed that it was not until a month later that, in December 2013, that the audit ended. *See* DSSUMF ¶ 56; PRSUMF ¶ 56. No contradictory information from the DOL is before the Court. Therefore, a fact issue remains as to whether the DOL sought and was about to interview Plaintiff at the time Defendants terminated her employment.

The Court concludes that on these facts a reasonable jury could find that at the time Defendants terminated her, Plaintiff was "about to testify" for a DOL audit under or related to the FLSA, which constitutes a protected activity.

### b. Adverse Employment Action

Defendants do not dispute that they terminated Plaintiff. "[T]ermination plainly qualifies as an adverse employment action." *See Lakeside-Scott v. Multnomah Cnty.,* 556 F.3d 797, 803 (9th Cir. 2009) (citing *Umbehr,* 518 U.S. 668, 675 (1996); *Ray v. Henderson,* 217 F.3d 1234, 1237 (9th Cir. 2000)).

//

c.   Substantial Motivating Factor

Plaintiff asserts that Defendants were motivated to fire her because they believed that under 29 CFR 541.300 she was misclassified as "professionally exempt," and also believed that if the audit revealed that information, it would result in DOL fines against the company. *See* Doc. 17 at 15; Knox Depo. at 39:22-25. This stems from the provision's instruction that that "[t]he best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree." 29 CFR 541.301(e) (5). Plaintiff claims that in her role as a senior accountant she was classified as "professionally exempt," despite Defendants knowing that she did not hold an accounting degree for most of her tenure in 2012. Plaintiff alleges that by firing her before her interview with the DOL, Defendants sought to prevent the DOL investigator from meeting with her and asking about her education, thereby preventing the DOL investigator from potentially discovering a misclassification. Plaintiff alleges that Defendants' actions were calculated to insulate the company from negative DOL attention.

Defendants assert that they terminated Plaintiff as a result of an investigation prompted by Plaintiff's comments about Halloween and a Chewbacca office decoration. Defendants asserts that after the incident, Knox asked Jones to review Plaintiff's human resources file for prior issues, and they discovered that Bowen lied on her 2012 résumé and job application.

A plaintiff can demonstrate a causal link by showing that retaliation was a substantial or motivating factor for Defendants' adverse employment actions. *See Avila,* 758 F.3d 1101 (citing *Knickerbocker,* 81 F.3d at 911 (requiring retaliation to be a "substantial factor" in adverse employment action)); *see also Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr,* 518 U.S. 668, 675 (1996); *accord Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). Direct and circumstantial evidence may be used to show that the protected activity was a substantial factor in the adverse action. *See Coszalter v. City of Salem,* 320 F.3d 968, 977 (9th Cir. 2003) (finding that plaintiff may satisfy the "substantial factor" standard in numerous ways, either by timing or through statements by the employer showing its disapproval of the protected activity or by showing that the employer's proffered reasons for the adverse action were pretextual). Also, timing alone may demonstrate causation, so inferred when a Defendants has taken adverse actions

18

closely following the protected activity. *See Thomas v. City of Beaverton,* 379 F.3d 802, 812 (9th Cir. 2004) (citation omitted); *see also Van Asdale v. Int'l Game Tech,* 577 F.3d 989, 1003 (9th Cir. 2009) (cautioning against "analyzing temporal proximity without regard to its factual setting" (citation and internal quotation marks omitted)).

Here, the timing of relevant events is undisputed. On or about October 21, 2013, the DOL informed Defendants that it would like to interview Plaintiff for the DOL audit. Closely following the incident, on November 12, 2013, Defendants terminated Plaintiff's employment. The Court finds that as Plaintiff was "about to testify" in an FLSA proceeding about which Defendants had notice, this close temporal proximity sufficiently demonstrates causation. *See Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.").

Moreover, additional evidence other than mere timing exists to support finding a causal link. It is undisputed that although Plaintiff did not have her degree until October 2012, Defendants classified her as "professionally exempt" for the duration of her employment (April 2012 through November 2013), and the DOL sent notices about the audit in October 2013. Record evidence shows that at some point during the audit Knox and Canaday researched California's professional status exemption and became or were familiar with its requirements. *See* Doc. 17-4. Specifically, Knox and Canaday weighed concerns about employee classification because they believed that having employees misclassified as professionally exempt, if discovered, would draw DOL penalties. *See* Knox Depo. at 39:22-25; Doc. 17-4, Ex. 1. Deferring to Plaintiff's facts, Columbine's representatives knew that she did not have her degree when she was hired in April 2012. Plaintiff testified that during the interview and hiring process she informed Meadows and Knox that she did not yet have her degree, although she soon expected it. *See* Bowen Decl. at ¶ 5. Laura Hill, a manager at the staffing agency that placed Plaintiff at Columbine, testified that in the course of the interview and hiring process Hill told her contacts at the company that Plaintiff did not yet have her degree. *See* Doc. 18.

Defendants generally dispute that anyone at the company knew that Plaintiff did not have her degree. However, Knox concedes that he knew by sometime in 2012. *See* Knox Depo. at 31:21-

19

24; 32:15-25. But even assuming that Knox's discovery about Plaintiff's degree was delayed to late

2012, his date is prior to the 2013 audit. By then, because Knox had long known information which

could indicate professional exemption misclassification – and not only had it but had at no time

acted upon it – a reasonable jury could infer that a more recent variable, the audit, motivated him to

terminate Plaintiff in order to suppress information from the DOL investigator. Plaintiff's argument

is made stronger because, of the employees on the DOL's to-be-interviewed list, it is undisputed

that Plaintiff was the only one about whom Knox had such information and she was the only one

fired around the time of the audit.

A reasonable person could infer from the record evidence that Knox perceived Plaintiff's

upcoming interview with the DOL as threatening economic penalties against the company, and his

fear of reprisals from the DOL was a substantial motivating factor in his decision to take adverse

employment action against Plaintiff. The Court finds the record evidence is sufficient to

demonstrate causation. *See Coszalter,* 320 F.3d at 977. For these reasons, the Court concludes that

Plaintiff has satisfied her burden to demonstrate a prima facie case of retaliation. *See Yartzoff v.

Thomas,* 809 F.2d 1371, 1376 (9th Cir. 1987) (finding that a plaintiff satisfied his prima facie

burden where an adverse employment action was taken "less than three months after he" engaged in

protected conduct).

2.   Legitimate Nondiscriminatory Reasons for Adverse Action

Thus the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for

the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802. Defendants' burden is

merely one of production, not persuasion. *Hawn v. Executive Jet Mgmt., Inc.,* 615 F.3d 1151, 1155

(9th Cir. 2010) (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trs.,* 225 F.3d 1115, 1123-24 (9th

Cir. 2000)).

To rebut the presumption created by a prima facie case, a defendant must raise a genuine

issue of fact as to whether it discriminated against the plaintiff and "[t]o accomplish this, the

Defendants must clearly set forth, through the introduction of admissible evidence, the reasons for

the plaintiff's rejection." *Burdine,* 450 U.S. at 254-55.

Defendants claim that, independent of the DOL audit, Knox legitimately came to his

decision to terminate Plaintiff because "she lied on her résumé and employment application in order

to obtain employment with Columbine." Doc. 15-1 at 15.

With this explanation, Defendants has articulated a legitimate, nondiscriminatory reason for

its adverse employment action against Plaintiff.

### 3.  Pretext

The burden next shifts to Plaintiff, who can prove pretext in two ways: (1) "indirectly by

showing that the employer's proffered explanation is unworthy of credence because it is internally

inconsistent or otherwise not believable," or (2) directly, "by persuading the court that a

discriminatory reason more likely motivated the employer." *Villiarimo,* 281 F.3d at 1062 (quoting

*Chuang.,* 225 F.3d at 1123); *see also Mayes,* 2014 WL 2506195, at *11.

The employee must meet the employer's evidence with "specific, substantial evidence of

pretext." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 890 (9th Cir. 1994) (quoting *Steckl v. Motorola,*

*Inc.,* 703 F.2d 392, 393 (9th Cir. 1983)). Direct evidence can be discriminatory or retaliatory

statements or actions by the employer. *Munoz v. Mabus,* 630 F.3d 856, 865 (9th Cir. 2010); *Godwin*

*v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir. 1998) ("'Direct evidence is evidence, which if

believed, proves the fact of [discriminatory animus] without inference or presumption.'") (quoting

*Davis v. Chevron, U.S.A., Inc.,* 14 F.3d 1082, 1085 (5th Cir. 1994)) (alteration in original). On the

other hand, "circumstantial evidence . . . tends to show that the employer's proffered motives were

not the actual motives because they are inconsistent or otherwise not believable." *Godwin.,* 150

F.3d 1222. "Where the evidence of pretext is circumstantial, rather than direct, the plaintiff must

present 'specific' and 'substantial' facts showing that there is a genuine issue for trial." *Noyes v.*

*Kelly Services,* 488 F.3d 1163, 1170 (9th Cir. 2007) (quoting *Godwin,* 150 F.3d at 122). A plaintiff

must show more than that the employer's justification is false because "courts only require that an

employer honestly believed its reason for action, even if its reason is foolish or trivial or even

baseless." *Villiarimo,* 281 F.3d at 1063 (internal citation and quotation marks omitted). The

evidence as to pretext, whether direct or indirect, must be considered cumulatively. *Chuang,* 225

F.3d at 1129.

Plaintiff introduces additional evidence showing that her case is sufficient to survive summary judgment because she raises a genuine issue of material fact about the veracity of Defendants' honest belief about the given justification for the adverse action.

The record evidence supports that Defendants' contentions strain credibility. Defendants explain that Knox heard that Plaintiff was offended by the office Halloween decorations – specifically a Chewbacca poster hanging in a co-worker's cubicle. According to Defendants, the Chewbacca incident led Knox to investigate Plaintiff's human resources file, which in turn led him to allegedly discover that when he hired Plaintiff she did not have a degree despite her affirmative statements on her application and résumé that she did. Yet this is inconsistent with Knox's testimony. Knox testified that it was not Plaintiff who made the initial comment about the Chewbacca poster, rather, he did. *See* Knox Depo. at 35; 37:17-22. Knox admits that in Plaintiff's presence he said about the Chewbacca poster something to the effect that Ms. Valdez looked like Chewbacca when she woke up in the morning. *See* Knox Depo. at 35, 37:17-22. Subsequently, Knox learned that Plaintiff complained to co-workers that she found his comment about Ms. Valdez to be offensive and believed that it constituted harassment. *See id.* at 39:6-9. This is the event which Defendants argue compelled Knox to request that Jones, in human resources, investigate Plaintiff's human resources file to find out whether she had a degree.

The Court finds no logical connection between the instigating event (Knox learning about Plaintiff's reaction to his comment) and Knox's investigation about whether Plaintiff had a degree when first hired. By making the logical leap to request that Jones conduct such a specific investigation (requesting that she find out whether Plaintiff had her degree when first hired), Knox's granular request suggests that he knew at the outset of the errand what Jones would find. The Court concludes that a reasonable jury could infer from this indirect evidence that Knox's investigation of Plaintiff was contrived and that Defendants' justification is unworthy of credence.

Additional evidence supports Plaintiff's argument that retaliatory animus fueled Defendants' adverse action. Defendants assert that Plaintiff, by including inaccurate information, lied on both her employment application form ("the application") and résumé, which Knox

22

discovered sometime between October 31 and November 12, 2015. For this reason Defendants argue they were justified in terminating Plaintiff.

The parties agree that the application, supplied by Defendants, has a column header titled "Type of Degree Granted or Expected," under which Plaintiff wrote "Degree." *See* Doc. 17-5. On the form under the heading "Major," she wrote, "Accounting," and listed her overall grade point average as 3.89 out of a possible 4.0. *Id.* The parties do not dispute that Plaintiff's résumé, supplied to Columbine in approximately April 2012, stated that the University of Phoenix awarded Plaintiff an accounting degree in "*February 2012* [emphasis in original]," although the Plaintiff did not actually receive her degree until October 2012.

Even so, Defendants' assertion that Knox "discovered" information in 2013 compelling him to fire Plaintiff is contrary to his testimony and other record evidence. Knox admits that sometime in 2012, before the audit and the decision to fire Plaintiff, he knew that she had not completed her degree. *See* Knox Depo. at 32-33. Therefore, Defendants' proffered justification that in 2013 he newly "discovered" that when hired Plaintiff did not have her degree is internally inconsistent. It is tautological that Knox could not discover something he admits he already knew.

But even assuming, *arguendo*, that Knox did not learn about Plaintiff's degree status until October 2013, undisputed evidence demonstrates that Plaintiff did not lie on her application. On it, Defendants poses a question with two alternative predicates: asking what type of degree the applicant has been **granted or expected**. In other words, Defendants' question directs an applicant to name a degree, even if only anticipated – the same conduct about which Defendants complain is an offense worthy of termination. In practice, for example, if an applicant had just started medical school the accurate and appropriate answer, given the nature of this compound question, would be "M.D." Whatever confusion may arise from this answer is due to the absence on the application of any prompt for an explanation. Indeed, there is only a small box in which to reply to the question and does not include any follow up questions to distinguish whether an applicant means to indicate a degree held or expected. For instance, there is neither direction to circle "granted" or "expected," nor a prompt to enter an expected graduation year.

For clarity, the Court includes an excerpt from Plaintiff's actual application:



*See* Doc. 17-5. As seen above on the third line, Plaintiff does not indicate that she has graduated from University of Phoenix, nor does she make an affirmative statement about a date upon which she expects that degree. Notably, there is a slash through the word "or." Because the question is phrased in the disjunctive (the degree is either "granted" or "expected"), such a mark could be an effort by Plaintiff to indicate which of these applies to her.

Defendants also contend that Plaintiff lied in a separate "Degree/Diploma" section answered in the affirmative that she had an accounting degree. DSSUMF ¶ 16. Although Defendants do not challenge that Plaintiff did, at the time she applied, hold an accounting degree from a different school (Sir Sandford Fleming College). Bowen Decl. ¶ 2.

Therefore, a reasonable jury could conclude that Plaintiff accurately answered the questions posed to her on the employment application. The Court concludes that sufficient evidence exists to demonstrate that Defendants' proffered justification for terminating Plaintiff on the basis of lies on the application is not believable. Consequently, a reasonable fact finder could conclude that a nonexistent issue could not be the actual reason Defendants decided to terminate Plaintiff.

As to her résumé, Plaintiff emphasizes that Defendants' assertion that she lied on the document is demonstrably false and, in fact, is indirect evidence of pretext. Plaintiff contends that when she moved to Bakersfield in August 2011, she drafted her résumé expecting her degree to be awarded in early 2012. She included on it a line describing her accounting degree at University of Phoenix, giving her graduation date as "*February 2012*." If, as the Court must accept at this stage, Plaintiff produced the document in August 2011, then describing the degree as awarded five months in the future would make it clear to any reader before that date that she did not yet have her degree. The degree's date is further distinguished from the other dates printed on Plaintiff's résumé because

24

the font is formatted in italics, whereas every other date is not in italics. This supports Plaintiff's contention that rather than obfuscate the date of her degree, she sought to highlight the anticipated future date. Defendants do not meaningfully challenge how it came to be that Defendants in 2012 had Plaintiff's 2011-produced résumé. Plaintiff asserts that in 2011 she gave her résumé to CFS, which retained the résumé in order to assist her with her job search. Then, during Columbine's recruiting in approximately April 2012, CFS identified Plaintiff as a potential applicant and gave Plaintiff's résumé to Columbine. *See* Doc. 17-11, Bowen Depo. at 33.

However, the parties dispute when, exactly, it was that Knox and others at the company first knew or were told that Plaintiff did not have a degree relative to when they hired her. Plaintiff testified that during her interviews she alerted Meadows that she did not yet have her degree (*see* Bowen Depo at 23:12-18), after which she met with Knox (*see id.* at 28:23-25).

In Hill's declaration, *see* Doc. 18, the CFS manager indicated that she has personal knowledge that during the recruiting process in early 2012 she disclosed to Columbine that Plaintiff did not then have a degree. *See Nigro,* 784 F.3d at 498. This evidence is sufficient to establish a genuine dispute of material fact as to whether Knox and others at Columbine knew when they hired Plaintiff that she had not yet been awarded her degree. *See Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 498 (9th Cir. 2015) (finding that a declaration with personal knowledge is enough to substantiate a genuine issue of material fact). At this stage, the Court must proceed using Plaintiff's facts. Plaintiff contends that in April 2012 Knox learned from CFS that Plaintiff did not have her degree, and that Plaintiff during their April 2012 interview also told him about the stale information on her résumé.

From this evidence a jury could conclude that it was impossible for Knox to have believed in 2013 that Plaintiff lied on her résumé and, for that reason, find that Defendants' proffered justification is unworthy of credence.

The Court concludes that Plaintiff produces sufficiently "specific and substantial" evidence to create a genuine issue of material fact as to whether Defendants given justification for the adverse action was actually pretext. *See France v. Johnson,* 795 F.3d 1170, 1175 (9th Cir. 2015) ("a plaintiff's burden to raise a triable issue of pretext is hardly an onerous one") (citing *Earl v. Nielsen*

*Media Research, Inc.,* 658 F.3d 1108, 1113 (9th Cir. 2011) (internal citations and quotation marks omitted). This comports with the Ninth Circuit's "repeatedly held" directive "that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *France,* 795 F.3d 1175 (citing, *e.g., Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 499 (9th Cir. 2015); *Diaz v. Eagle Produce Ltd. P'ship,* 521 F.3d 1201, 1207 (9th Cir. 2008); *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1089 (9th Cir. 2008); *Metoyer v. Chassman,* 504 F.3d 919, 939 (9th Cir. 2007); *Dominguez-Curry v. Nev. Transp. Dep't,* 424 F.3d 1027, 1042 (9th Cir. 2005); *Chuang,* 225 F.3d at 1124). "This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Chuang,* 225 F.3d at 1124 (internal quotation marks omitted).

In sum, viewed in the light most favorable to Plaintiff, the record evidence allows a jury to infer that Knox's proffered justification for terminating her is unworthy of credence and was merely pretext to terminate her for her imminent involvement with the DOL audit. *See Burdine,* 450 U.S. at 256 (a plaintiff may show pretext either directly or indirectly).

## II.   STATE LAW CLAIMS

### A. Second Cause of Action: Wrongful Termination in Violation of Public Policy

In addition to her federal cause of action, Plaintiff asserts a state common-law tort claim of wrongful termination in violation of public policy based on Defendants' alleged violations of the California Whistleblower Protection Act (California labor Code §1102.5(b)), which provides:

> (b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

Defendants argue that they are entitled to summary judgment because the adverse action against Plaintiff does not implicate a fundamental public policy and, rehashing the same argument

as above, because Plaintiff did not undertake any protected activity, but, even if she did, no causal

link exists between the protected activity and her termination.

Under California common law, although "an at-will employee may be terminated for no

reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful

reason or a purpose that contravenes fundamental public policy." *Dep't of Fair Employment &*

*Hous. v. Lucent Technologies, Inc.,* 642 F.3d 728, 748-49 (9th Cir. 2011) ) (internal quotations

omitted) (quoting *Silo v. CHW Med. Found.,* 27 Cal.4th 1097 (2002). A California at-will

employee-plaintiff may bring a wrongful termination claim asserting that Defendants' adverse

employment action contravenes the fundamental principles of public policy. *Tameny v. Atl.*

*Richfield Co.,* 27 Cal.3d 167, 170 (1980); *see also Kelly v. Methodist Hospital of Southern Cal.,* 22

Cal.4th 1108, 1112 (2000) ("*Tameny* claims permit wrongful termination damages when a

termination is undertaken in violation of a fundamental, substantial and well-established public

policy of state law grounded in a statute or constitutional provision."). To prevail in a *Tameny*

claim, a plaintiff must show that (1) an employer-employee relationship existed; (2) plaintiff's

employment was terminated; (3) the violation of public policy was a motivating reason for the

termination; and (4) the termination was the cause of plaintiff's damages. *Haney v. Aramark Unif.*

*Servs., Inc.,* 121 Cal. App. 4th 623, 641 (Cal.Ct.App. 2004).

Defendants do not challenge that the parties had an employer-employee relationship or that

they took an adverse employment action against Plaintiff. Also, the Court has already concluded,

*supra*, that Plaintiff presents sufficient evidence to demonstrate a causal link between the protected

activity and the adverse action. Therefore, the Court proceeds to evaluate the third prong, whether

circumstances implicate a public policy.

To support a claim for wrongful discharge in violation of public policy, a plaintiff must

show that the underlying policy is: "(1) delineated in either constitutional or statutory provisions;

(2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the

interests of the individual; (3) well established at the time of the discharge; and (4) 'substantial' and

'fundamental.'" *Saba v. Unisys Corp.,* – F.Supp.3d – , No. 14-CV-01310-WHO, 2015 WL

4397323, at *10 (N.D. Cal. July 17, 2015) (internal citations omitted) (quoting *Diego v. Pilgrim*

1  *United Church of Christ,* 231 Cal. App.4th 913, 921 (2014)); *see also Stevenson v. Super. Ct.,* 16

2  Cal.4th 880, 889-90 (1997).

3  　　　Here, Plaintiff relies on §1102.5(b) of the California Labor Code, which provides in relevant

4  part that "[a]n employer . . . shall not retaliate against an employee . . . because the employer

5  believes that the employee . . . disclosed **or may disclose** information [] to a government or law

6  enforcement agency . . . ." Based on this language, the Court finds that the section expresses a

7  public policy of protecting employees who the employer believes "may disclose" adverse

8  information to a government agency. The provision specifically differentiates between information

9  already "disclosed," and that which an employee "may disclose" in the future, and explicitly

10  provides protections to employees in both instances. Defendants do not cite to, and the Court cannot

11  find, legal authority to support Defendants' argument to read this phrase out of the text.

12  　　　Accordingly, where, as here, an employer allegedly terminated an employee as a result of

13  being notified by a government agency that it sought to interview Plaintiff for the agency's audit, an

14  interview during which the employer believes Plaintiff may disclose adverse information about the

15  company's perceived noncompliance with California labor codes (the professional exemption), it

16  implicates the public policy expressed in § 1102.5(b).

17  　　　Although Defendants also dispute whether Plaintiff participated in a protected activity, the

18  Court has already determined, *supra*, that record evidence shows a genuine issue of material fact

19  whether the DOL anticipated interviewing Plaintiff in relation to the audit at the time Defendants

20  decided to terminate her. Deferring to Plaintiff's facts, as it must at this stage, the Court finds that

21  on this same evidence a reasonable jury could likewise conclude that Defendants believed that the

22  DOL was about to interview Plaintiff, during which Defendant believed Plaintiff would likely

23  disclose information adverse to the company, and conclude that Plaintiff's involvement constitutes

24  protected activity under § 1102.5(b).

25  　　　The Court thus concludes that Defendants' argument that circumstances do not implicate a

26  public policy fails.

27  //

28  //

28

**B.  Third Cause of Action: Wrongful Discharge in Violation of § 1102.5**

In order to establish a prima facie case for a labor code violation under § 1102.5, "a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." *Mokler v. County of Orange,* 157 Cal. App.4th 121, 138 (2007)).

The same *McDonnell Douglas* burden-shifting framework discussed above also governs state law wrongful termination claims. *See Loggins v. Kaiser Permanente Int'l,* 151 Cal. App. 4th 1102, 1108-09 (2007); *Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1090-93 (9th Cir. 2001) (the *McDonnell Douglas* burden shifting framework applies to state law claims pursued in federal court). In the California state-law context Plaintiff here again must show that:

> (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) If the employee successfully establishes these elements and thereby shows a *prima facie* case exists, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action. (*Morgan v. Regents of University of California* (2000) 88 Cal. App. 4th 52, 68.) If the employer produces evidence showing a legitimate reason for the adverse employment action, "the presumption of retaliation "drops out of the picture, " (*Yanowitz, supra*), and the burden shifts back to the employee to provide "substantial responsive evidence" that the employer's proffered reasons were untrue or pretextual. (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal. App. 4th 1718, 1735).

*Loggins,* 151 Cal. App. 4th at 1109. Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity. *Morgan,* 88 Cal. App. at 70.

On a motion for summary judgment on state law claims, however, the parties' burdens are reversed. Rather than a plaintiff's burden, instead it is the moving Defendants who "must bear the initial burden of showing that the action has no merit, and the plaintiff will not be required to respond unless and until the Defendants has borne that burden." *Lockheed Missiles & Space Co.,* 29 Cal. App.4th at 1730 (internal citations and quotations omitted); *accord Lucent Technologies,* 642 F.3d at 745.

In other words, to warrant summary judgment, a defendant must satisfy the initial burden of showing "(1) the plaintiff cannot establish one or more of the elements of his or her prima facie

case or (2) there was a legitimate, non-retaliatory reason for terminating the plaintiff." *See Hess v. Madera Honda Suzuki,* No. 1:10-CV-01821-AWI, 2012 WL 4052002, at \*12 (E.D. Cal. Sept. 14, 2012) (citing *Wills v. Superior Court,* 195 Cal. App.4th 143, 160 (2011); *Lucent Technologies,* 642 F.3d at 745 (citing *Avila v. Continental Airlines, Inc.,* 165 Cal. App.4th 1237 (2008)). Then "[i]f the employer presents admissible evidence that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, [non-retaliatory] factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the Defendants' showing." *Caldwell v. Paramount Unified School Dist.,* 41 Cal. App.4th 189, 203 (1995). A plaintiff may satisfy her burden by "produc[ing] substantial responsive evidence that the employer's showing was untrue or pretextual." *Lucent Technologies,* 642 F.3d at 746 (quoting *Hanson v. Lucky Stores, Inc.,* 74 Cal. App.4th 215, 224 (1999)).

Accordingly, the Court first proceeds to determine whether Defendants demonstrates that Plaintiff fails to establish a prima facie case of wrongful termination in violation of § 1102.5(b), the familiar elements of which are: "(1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." *Patten v. Grant Joint Union High Sch. Dist.,* 134 Cal. App. 4th 1378, 1384 (2005) (citing *Akers v. County of San Diego,* 95 Cal.App.4th 1441, 1453 (2002)).

This the Defendants cannot do. The Court has already determined, *supra,* that Plaintiff has demonstrated a prima face case of retaliation. For the same reasons articulated at length above, the Court finds that Plaintiff has also demonstrated a *prima facie* case that Defendants violated § 1102.5. Because Defendants do not substantively present new evidence or arguments as to this similar claim, the Court finds that Defendants likewise fail to bear their burden to demonstrate that one or more of Plaintiff's prima facie wrongful termination elements is lacking.

As a result, summary judgment on Plaintiff's third cause of action is unwarranted.

**C. Fourth Cause of Action: Violation of California's Private Attorney General Act**

Defendants argue that California Labor Code § 2699, known as PAGA, "is not a statute that can be violated as Plaintiff alleges . . . [r]ather, it allows a Plaintiff to sue on behalf of other current or former employees as well as herself, for violations of the Labor Code." *See* Doc. 15-1 at 18:9-11.

Defendants peg Plaintiff's PAGA claim to her third cause of action for wrongful discharge in violation of § 1102.5, *see id.* (citing Labor Code § 2699.5; Compl. ¶ 37), and argue that "[a]s Plaintiff's third cause of action fails, so must the fourth." *Id.* However, PAGA explicitly includes violations of 1102.5 as a basis for recovery. *See* Cal. Labor Code § 2699. As to Plaintiff's third cause of action, the Court found, *supra*, that the claim survives summary judgment. Thus, Defendants' argument about the fatal effect of Plaintiff's third claim is unavailing. Because Defendants offer no other reason why summary adjudication is appropriate, *see* Doc. 15-1 at 18:15-25, the Court concludes that Defendants are not entitled to summary judgment on this claim.

### D.  Fifth Cause of Action: Defamation

Plaintiff believes that after Defendants fired her, Defendants' representatives told third parties, including potential employers, that Plaintiff lied on the company's application materials. In addition to disclosure to third parties, Plaintiff asserts that Defendants' actions have compelled her to self-publish defamation by disclosing to would-be employers Defendants' defamatory statements in order to explain the proffered justification for her termination.

Defendants primarily argue that Plaintiff has not alleged defamation with sufficient specificity, emphasizing that she has not identified a specific potential employer to whom anyone at Columbine told a defamatory statement. But, Defendants argue, even if Plaintiff has, "[t]ruth is an absolute defense to a claim of defamation." Doc. 15-1 at  (citing *Campanelli v. Regents of Univ. of Cal.,* 44 Cal. App.4th 572, 581-82 (1996)).

To prevail in a defamation claim under California law, a plaintiff must allege "(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus v. Loftus,* 40 Cal.4th 683, 720 (2007). A false publication is one that expresses provable facts, not merely opinions. *See Gregory v. McDonnell Douglas Corp.,* 17 Cal.3d 596, 604 (1976). California law imposes a one-year statute of limitations on defamation claims, *id.* § 340(c), therefore, such claims must be filed within one year of the

31

alleged offending conduct. *See Seid v. Pac. Bell, Inc.,* 635 F.Supp. 906, 910-11 (S.D.Cal. 1985). In defamation actions, the truth of the statement is a complete defense against liability, regardless of bad faith or malicious purpose. *Ringler Associates Inc. v. Maryland Cas. Co.,* 80 Cal. App. 4th 1165, 1180 (2000).

The parties do not dispute that publishing statements that a former employee lied on her application materials would be considered injurious to her career as an accountant. Nor do Defendants contend that the communication at issue is privileged or would not have the tendency to injure such a plaintiff. The Court therefore proceeds to evaluate the first and second prongs, whether (1) a defamatory statement was published; and, (2) whether the statement, if any, is false.

### 1.   Publication

Plaintiff filed this suit on March 20, 2014, including a timely defamation claim about statements she alleges Defendants' representative made between approximately November 12, 2013, and March 2014. *See id.* Plaintiff also alleges that she was forced to self-publish Defendants' defamatory statements in order to explain to potential employers why she was terminated.

Defendants argue that Plaintiff has not demonstrated that anyone at Columbine published a defamatory statement against Plaintiff. Other than their assertion that no one at Columbine made a defamatory statement, Defendants do not otherwise address Plaintiff's contention about self-publishing, other to an assert an affirmative defense.

To be actionable, a defamation claim requires some communication, whether oral or written, to be published. Cal. Civ.Code §§ 45, 46; *see Live Oak Publishing Co. v. Cohagan,* 234 Cal. App.3d 1277, 1284, 286 Cal.Rptr. 198 (1991). Slander and libel are defined under California law and require a "false and unprivileged publication," accomplished as "orally uttered," Cal. Civ.Code § 44 (slander[3]), or "by writing," *id.* § 45 (libel[4]). Publication to a single individual is sufficient to satisfy this element. *Ringler,* 80 Cal. App.4th at 1179.

---

[3] "Slander is a false and unprivileged publication, orally uttered, . . . which," among other things, "[t]ends directly to injure [a person] in respect to his office, profession, trade or business." *Id.* § 46.
[4] "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation . . ., which exposes any person to hatred, contempt, ridicule, or obloquy, . . . or which has a tendency to injure him in his occupation." Cal. Civ. Code § 45.

Generally, "[a] plaintiff cannot manufacture a defamation cause of action by publishing the statement to third persons; the publication must be done by the Defendants." *Live Oak*, 234 Cal. App.3d at 1284. An exception lies where it is foreseeable that the defendant's acts would lead to publication. *Id.* The narrow exception applies where, "because of some necessity [plaintiff] was under to communicate the matter to others, it was reasonably to be anticipated that he would do so." *Id.* at 1285.

Plaintiff relies on *McKinney v. County of Santa Clara*, 110 Cal. App.3d 787 (1980), for the proposition that self-compelled publication can substantiate a claim of defamation. In *McKinney*, a former law enforcement officer repeated his former employer's allegedly defamatory statements to potential employers during job interviews. *Id.* at 792-93. The officer argued that it was foreseeable that he would be compelled to do so, given that anyone would anticipate that he would be asked in future interviews why he was no longer at his former job. *Id.* at 795. The *McKinney* court reasoned that in this context the exception applies because "the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the contents of the defamatory statement to a third person *after* he has read it or been informed of its contents." *Id.* at 796 (emphasis in original).

To determine whether the self-publishing exception applied, the court developed a three-part test: (1) the originating-defendant (the source of the defamatory statement) must be aware that the defamed plaintiff would be "under a strong compulsion to disclose the contents of the alleged defamatory statements to third parties"; (2) it must be reasonably foreseeable that the defamed party would disclose the statements; and, (3) the plaintiff has actually published the substance of the original defamatory statement to third parties.[5] *Id.* at 798. About the instant allegations of the original defamatory statement, when slander is at issue a general allegation of a defamatory oral utterance may be sufficient. *See, e.g., Charlson v. DHR Int'l Inc.,* No. 14–cv–03041–PJH, 2014 WL

---

[5] The court noted that this exception comports with other jurisdictions, which "have held the originator of the defamatory statement liable for damages caused by the disclosure of the contents of the defamatory statement by the person defamed where such disclosure is the natural and probable consequence of the originator's actions." *McKinney,* 110 Cal. App. 3d at 796.

4808851, at *6 (N.D.Cal. Sept. 26, 2014) (finding that in an action for slander, rather than providing a specific statement, "it may be sufficient for the plaintiff to simply allege the substance of the statement").

In the instant case, it is undisputed that Defendants are the originating source of the allegedly defamatory statement about Knox's justification for firing Plaintiff. Specifically, Jones testified that she personally recollects Knox telling her that Plaintiff "lied" on her application materials and it was for this reason that she was fired. *See* Jones Depo. at 54:4-9. She also testified that Knox directed her to memorialize the statement in a human resources document, *see id.*, which Jones and Canaday had Plaintiff sign, under protest, during the meeting when they terminated her. *See id.* at 54:10-22. On that basis, the Court finds that, as in *McKinney*, Plaintiff was compelled to disclose the contents of the defamatory statement only *after* she had read Defendants' document and been informed by Defendants of its contents. *McKinney,* 110 Cal. App.3d at 796.

The question becomes whether it was reasonably foreseeable that Plaintiff would be called to explain Defendants' proffered justification for her termination. *Live Oak*, 234 Cal. App.3d at 1285 (applying the exception in an employment context where "the employee must explain the statement to subsequent employers, who will surely learn of it if they investigate his or her past employment"). As in *McKinney*, Plaintiff alleges that she was forced to self-publish Defendants' defamatory statements in order to explain in interviews with potential employers why she was terminated. The Court must, at this stage, defer to Plaintiff's facts. Weighing her credibility is the province of a jury. It is undisputed that Defendants told Plaintiff that she was being terminated for lying on her application materials because Knox and human resources created a paper trail about the proffered justification. With that cloud over her, the Court concludes that it was foreseeable that Plaintiff would be compelled in future interviews to explain her former employer's proffered justification for firing her. *See id; accord McKinney*, 110 Cal. App.3d at 796.

Defendants generally challenge Plaintiff's self-publishing argument, but cite no legal authority. Because Plaintiff adduces sufficient evidence from which a jury could conclude that she was compelled to self-publish, Plaintiff meets her burden to demonstrate the first element of a

defamation claim. The Court therefore need not reach whether the statement was published in other ways.

### 2.   Veracity of Alleged Original Defamatory Statement

The Court has determined, *supra*, that a genuine dispute of material fact remains for a jury whether at the time he fired Plaintiff Knox believed that she had lied on her résumé. As this is a credibility issue that requires weighing the evidence, it is the province of a jury to decide. The Court concludes that the record evidence shows the parties facts critically diverge on material facts, thus Plaintiff's fifth cause of action for defamation survives summary judgement.

### A.   CONCLUSION AND ORDER

The Court has determined that as to the FLSA claim, genuine issues of material fact remain for a trier of fact, therefore summary judgment is inappropriate on Plaintiffs' first cause of action. As to Plaintiffs' various state-law wrongful termination claims, the same genuine issues of material fact persist for trial. Finally, an exception to the general rule on defamation applies based on the record evidence, and Plaintiff offers sufficient evidence from which a jury could infer that she was compelled to self-publish a false, defamatory statement that originated with Defendants, for which a jury could find Defendants liable. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 15) is **DENIED.**

IT IS SO ORDERED.

Dated:   __November 2, 2015__          ___/s/ Lawrence J. O'Neill___
                                        UNITED STATES DISTRICT JUDGE